UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SEAMUS LYONS & NOEL NELSON,

      Plaintiffs,

vs.

STATE OF NEW YORK, DIVISION OF
STATE POLICE, JOSEPH D'AMICO, sued        15 cv 03669 (NSR)
in his individual capacity,

      Defendants.

--------------------------------------------------------x


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SUSSMAN & ASSOCIATES
P.O. Box 1005
1 Railroad Ave.
Goshen, New York 10924
(845) 294-3991
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

    A.    Background ............................................................................................ 1

    B.    The "Missing Drug Evidence" Situation ............................................... 1

    C.    The NYSP's Investigation(s) and Charges Against Plaintiffs ................ 6

    D.    Other Evidence of Discrimination and Retaliation ............................... 13

ARGUMENT ............................................................................................................. 14

POINT I:    NELSON'S RACE DISCRIMINATION CLAIMS SHOULD BE TRIED .......... 14

    A.    Nelson Was Subjected to Adverse Action ............................................ 14

    B.    A Jury Can Find Discrimination .......................................................... 16

POINT II:    PLAINTIFFS' RETALIATION CLAIMS SHOULD BE TRIED ...................... 19

    A.    Defendants Subjected Both Plaintiffs to Adverse Actions .................... 19

    B.    Plaintiffs Engaged in Known Protected Activity .................................. 21

    C.    A Reasonable Jury May Find Causation .............................................. 23

CONCLUSION .......................................................................................................... 26

## I.    PRELIMINARY STATEMENT

Plaintiffs, Seamus Lyons and Noel Nelson, respectfully submit this memorandum of law in opposition to the summary judgment motion of defendants State of New York, Division of Police ("NYSP") and NYSP Superintendent Joseph D'Amico ("D'Amico"). As there are numerous questions of material fact, defendants' motion should be denied.

## II.    STATEMENT OF FACTS [1]

### A.    Background

Plaintiff Noel Nelson is African-American and worked for the NYSP for more than 27 years. (Watkins Aff., Ex. 210 at 10:7-9). Plaintiff Seamus Lyons is Caucasian and worked for more than 12 years with the NYSP as a state trooper. (Ex. 21 at 8:7-10). At all relevant times, defendant Joseph D'Amico was the Superintendent of the NYSP. (Ex. 23 at 6:11-17, 20:13-24).

Plaintiff Nelson began with the NYSP in 1984, was promoted to Investigator in 1990 and, between 1990 and 2011, received numerous awards and commendations for his work. (Ex. 21 at 14:3-15:3, 28:8-24). Plaintiff Lyons was a highly decorated Trooper, who in 2012 was presented with two awards by Superintendent D'Amico based on his outstanding police work. (Ex. 23 at 119:6-122:6).

### B.    The "Missing Drug Evidence" Situation

On July 28, 2010, Nelson, who was then an Investigator with the Bureau of Criminal Investigations ("BCI"), which handles felony cases, received an order to transport certain evidence from the Mid-Hudson Regional Crime Lab (MHRCL) in Newburgh to an evidence locker at the SP Hawthorne barracks. (Ex. 21 at 34:16-36:7, 59:3-11; Ex. 1; Ex. 31 at 7:6-8:23). Nelson and Lyons

---

[1] Plaintiffs incorporate their Rule 56.1 Reply. In addition, all numbered exhibits referenced herein are annexed to the Affirmation of Christopher D. Watkins, submitted herewith.

drove to the MHRCL and while picking up other evidence to return to the Tarrytown barracks, a Lieutenant at the lab asked them to return certain drug evidence, namely bagged marijuana and cocaine, to the SP Hawthorne barracks, where drug evidence was stored after a BCI case had begun. (Id.). Nelson secured the evidence in the SP Hawthorne evidence locker and signed it into evidence on a "General 2" "Evidence Record" form ("General 2"), the form used by the NYSP to track evidence. (Ex. 21 at 56:3-60:9; Ex. 1).

At an unknown time over the course of the next several months, the evidence which Nelson delivered to SP Hawthorne was either destroyed or otherwise disappeared from the SP Hawthorne evidence locker without having been recorded as removed. (See, e.g., Exs. 1, 32).

The Senior Investigator responsible for the Hawthorne BCI evidence locker was Robert Bennett, who is Caucasian. (Ex. 31 at 7:6-8:23; Exs. 33, Ex. 2 at p. 16). Since 2006, Evelyn Campos, who is Caucasian, was the Evidence Custodian with responsibility for BCI evidence within Troop K, including at Hawthorne. (Ex. 30 at p. 7; Exs. 2, 3). According to a February 2012 "Historical Audit" report of Hawthorne BCI, the NYSP determined that, while Campos was Evidence Custodian, "several instances were noted wherein evidence was secured and forwarded for destruction without the authority and instructions for disposition written on a Genl 2 [the "General 2" evidence tracking form]." (Ex. 2 at p. 11). A March 2012 SP Hawthorne BCI Unit Evidence Audit" noted: "Cases in which Genl. 2 record indicated destroy evidence. Evidence in question not listed as destroyed on Genl. 2. No Destruction memorandums located. Inv. KIM CAMPOS was the Evidence Custodian. Evidence remains missing/unaccounted for." (Ex. 3 at p. 8).

With respect to the drug evidence that Nelson and Lyons transported from MHRCL to Hawthorne on July 28, 2010, there is no dispute that Nelson properly recorded that evidence on the

2

General 2 form maintained with the evidence – they are listed as Item Nos. 1 and 2. (Ex. 1).

According to Campos, at some point in September 2010, Senior Investigator Bennett called her and told her that he wanted her to pick up certain evidence for destruction from the Hawthorne BCI evidence locker on September 27, 2010 in anticipation of an upcoming evidence inspection. (Ex. 30 at p. 19). According to Campos, standard operating procedure dictated that when she picked up evidence from Hawthorne for destruction, Senior Investigator Bennett would be present with her to hand her the evidence and answer any questions she had. (Id. at 20:6-21:5). In addition, according to Campos (and all other witnesses with knowledge), standard operating procedure dictated that, before taking evidence for destruction, the Evidence Custodian needed written instructions that the case had been disposed and the evidence she was taking was to be destroyed; those instructions were supposed to appear on the General 2 itself, or at the least be attached to the General 2. (Ex. 30 at 14:14-15:3; Ex. 21 at 88-91; Ex. 3 at p. 5; Ex. 26 at 671:2-11).

Campos did not follow either of those procedures in this case. (See Ex. 30 at 14:20-16:14; 21:2-22:9). First, according to Campos, Bennett was not at Hawthorne when she came for the evidence; she was told he had called in sick. (Ex. 30 at 23:13-24:19). Nonetheless, according to Campos, she took evidence anyway, contrary to standard procedure, because she had "drove down the hour one way" from Troop K headquarters in Poughkeepsie. (Ex. 30 at 24:2-19). In addition, according to Campos, and the General 2 itself, she did not receive any written instructions that the case was disposed of or that she should remove the evidence for instruction. (Id. at 15:24-16:14). According to Campos, she had never before taken evidence to be destroyed without having any written authorization to do so. (Id.at 24:20-24; But see Ex. 3 at p. 8 (noting that Campos destroyed other evidence despite the absence of written authorization)).

3

According to Campos, and all other witnesses with knowledge, standard operating procedure dictated that the Evidence Custodian took any remaining evidence from the same closed case at the same time for later destruction. (Ex. 30 at 27:15-23; Ex. 21 at 88:25-91:10; Ex. 26 at 666:7-10). According to Campos, and the General 2 form, the items that she took for destruction from the relevant criminal case were only Item Nos. 3 and 4, a knife and a "Captain Morgan" bag. (Ex. 30 at 16:15-18:16, 27:7-30:4; Ex. 1). She did not take Items 1 and 2, the cocaine and marijuana, and she claimed they were not at the Hawthorne BCI locker on September 27, 2010. (Id.). Campos testified that, even though the General 2 showed that those items had been brought to "BCI Evidence" on July 27, 2010, she thought they might be at the Tarrytown station. (Id. at 16:15-18:9, 28:9-29:16). In her statements to Internal Affairs and Senior Investigator Jerome John, who began investigating Nelson's EEO complaint of race discrimination in October 2011, Campos claimed that–even though the General 2 form indicated that Nelson had brought the drugs from the MHRCL to SP Hawthorne in July–she thought they were still at the MHRCL in September, which facially makes no sense. (Ex. 10 at pp. 9-10; Ex. 7 at p. 22 ("When asked to explain why she didn't look for items 1 and 2, Inv. CAMPOS shared that she believed them to be at the Mid Hudson Regional Crime Lab"); Ex. 28 at 17:3-19:14; Ex. 23 at 77:14-78:16).

Campos admitted that she failed to ask anyone–not Bennett, Nelson, or the BCI Investigator on the underlying criminal case, Skylar King, or anyone else–where the drug evidence was. (Id.). According to Joanne Leoni, a BCI Senior Investigator, evidence from a closed case is **never** to be taken for destruction piecemeal, which is what Campos did here. (Ex. 26 at 666:7-10; see also Ex. 21 at pp. 92-93 (Nelson testifying that there were times that Campos would go to Hawthorne to pick up evidence from closed cases and not locate certain items, and she would then ask the responsible

4

investigators where the evidence was)). Campos took the General 2 form with her with the knife and bag, even though she claims that she did not take the drug evidence with her. (Ex. 11:13-12:17, 29:17-30:19, 32:22-33:2).

On October 6, 2010, Bennett reported that he and Lt. Chiumento, his BCI supervisor, had inventoried the Hawthorne BCI evidence, during which several errors were noted, but the report made no mention of any missing evidence, let alone the "drug evidence" that Nelson reported having delivered in July 2010. (Ex. 4). Three months later, on January 5, 2011, Bennett again reported that he had conducted an inventory, and that "all evidence has been accounted for." (Ex. 5).

In March 2011, the NYSP determined that 98 Oxycodone pills had been stolen from the SP Hawthorne locker. (Gagan Decl., Ex. C). The NYSP subsequently determined that Bennett likely stole the pills from the evidence locker: "Although S/Inv. BENNETT denied stealing evidence (98 ocycodone pills) from the SP Hawthorne BCI evidence locker, *surrounding circumstances strongly suggest that S/Inv. BENNETT did in fact take the drugs*. He had motive, opportunity and control of the evidence." (Id. at Bates #1346) (emphasis added).

However, despite being the prime suspect in the NYSP's missing Oxycodone investigation as early as April 2011, Bennett was retained in his position as BCI supervisor with full access to the SP Hawthorne evidence locker, and of course he had maintained ultimate control over that locker since July 2010, when Nelson recorded having delivered cocaine and marijuana from the Crime Lab. (Ex. At pp. 1-2; Ex. 34; Ex. 37 at p. 8B; Ex. 32). In or about June 2011, Bennett was laterally transferred to the Senior Investigator position over the Major Crimes unit, and in August 2011 he was allowed to retire without any charges ever brought against him. (Id.; Ex. 26 at 690-91).

5

In September 2011, Bennett's temporary replacement as Senior Investigator, Matthew Laspisa, discovered "inconsistencies and contradictory information with respect to Case SJS #3165705," the case involving the recovered cocaine, marijuana, knife, and bag. (Ex. 32). Per Laspisa'a report: "Review of SJS revealed that the case was still Pending Property Disposition [the cocaine and marijuana], however, there was no Genl. 2 or evidence at Hawthorne." (Ex. 32). Laspisa later detailed the chaos Bennett left: "Upon my transfer to SP Hawthorne on 08/18/2011, I found many of the administrative aspects of the station BCI unit to be in a total state of disarray. Case folders were scattered about the Senior's [Bennett's] office, some were thrown in no specific order in various file cabinets, and case files for the entire 2008 year were stacked in random order on a table top in the southeast corner of the squad room. . . . With respect to evidence it appeared that short cuts and complacency was the norm and correction was tasking." (Ex. 34). He described finding the underlying case file (SJS#316705) "while wading through stacks of case folders." (Id.).

According to a March 2012 NYSP report regarding Hawthorne BCI evidence, under Lt. Chiumento's supervision, Bennett may have "intentionally manipulated the records pertaining to the collection, recording and storage of evidence, for what can only be speculated reasons." (Ex. 2 at p. 16). Another NYSP report from December 2011 concluded that, under Chiumento's supervision, "Senior Investigator Bennett was allowed to ignore his supervisory responsibilities and to *actively mismanage* his operation to BCI Hawthorne." (Ex. 6 at p. 6) (emphasis added).

## C. The NYSP's Investigation(s) and Charges Against Plaintiffs

After Laspisa's September 2011 report, the NYSP's Internal Affairs (IA) unit began an investigation into the missing drug evidence, which included interviews with both plaintiffs.. (Ex. 3). In a March 2012 internal report of this investigation, NYSP determined that the Troop K

6

evidence custodian, Investigator Campos, who is Caucasian, transferred other evidence relating to the same investigation as the missing narcotics (the knife and bag) to SP Poughkeepsie "without appropriate authorization" and destroyed that evidence on November 15, 2010 and, by so doing, failed to show diligence in the performance of her duties. (Id. at pp. 5, 10). That same report noted that the evidence transported to SP Hawthorne by Nelson on July 28, 2010 "remains missing/unaccounted for." (Id.). The report did not attribute any blame to Nelson for the loss of the evidence, nor did it mention Lyons at all. (Id.).

From October through December 2011, both plaintiffs were directed to provide a total of three statements to Internal Affairs investigators concerning the July 2010 evidence transfer. (Ex. 21 at 96:4-18; Ex. 22 at 43:23-25; Ex. 12 at p. 2). Before their final IA interview in December 2011, IA Captain Casey called Nelson and told him that a review of cell phone records had shown that he and Lyons had been in Middletown, New York after leaving the MHRCL in Newburgh. (Ex. 21 at 81:14-20, 96:4-99:9). This triggered Nelson to recall that, after retrieving the evidence and before going to Hawthorne, he and Lyons had sought out a witness in an unrelated case, met Investigator Skylar King, and also stopped at a farm stand to purchase a pie. (Id.). None of that was relevant to the central issue in question, namely that plaintiffs had picked up the narcotics evidence in Newburgh and delivered it to SP Hawthorne. (Id.).

In their statements to IA investigators, both Nelson and Lyons asserted that the NYSP should review videotape from the SP Hawthorne Barracks if there was any question about whether they actually were there on July 28, 2010. (Ex. 22 at 54:9-19, 77:4-10; Ex. 21 at 133-34; Ex. 7 at p. 22-23; Ex. 23 at 68-69, 123-124; Ex. 41 at pp. 13-14). There were several surveillance cameras at Hawthorne, both inside and out. (Id.). However, the NYSP would later claim that the videotape for

that date had not been working. (Id.). However, Jerome John, an NYSP Senior Investigator with oversight of investigating internal EEO complaints, reviewed videotape of SP Hawthorne from July 28, 2010 as part of his investigation of Nelson's internal EEO complaint of race discrimination. (Ex. 7 at p. 14; Ex. 28 at 19:16-34:18, 62:9-64:15, 100:15-103:7). The video showed a marked Chevy Tahoe–the same type of car driven by Lyons on that date–leaving the barracks' parking lot in the early afternoon on that afternoon. (Id). Although the time stamp was likely off by approximately 30 minutes, the time aligned with the time that plaintiffs would have been leaving Hawthorne based on their accounts and other evidence. (Id.). Although video footage from SP Hawthorne was requested by plaintiffs' counsel during their administrative proceedings, the defendants never provided it to them until long after they had left the NYSP and commenced this lawsuit. (Id.; Ex. 21 at 133:21-134:9). The video footage corroborates John's account and tends to exonerate plaintiffs and support their account of events. (Id.; Ex. 39).

In October 2011, citing the pending investigation regarding the missing evidence, NYSP transferred plaintiff Nelson from SP Tarrytown to SP Hawthorne. (Ex 7 at p. 5; Ex . 21 at 99:24-127:10; Ex 7l Ex. 8; Ex. 26 at 678:24-691, 797:21-799:15). Concurrently, NYSP stripped Nelson of his jurisdiction as an investigator, disallowed him access to the SP Hawthorne evidence locker, and curtailed his regular overtime pay, which he had received for many years. (Id.). NYSP did not take any similar action against plaintiff Lyons, although he was equally involved in the retrieval and delivery of the evidence. (Id.). Following this transfer, NYSP subjected Nelson to extensive micro-management, including by subordinates. (Id.). In addition, it forbade Nelson from handling evidence and disallowed him from continuing his unfinished investigations or commencing and fully handling new investigations. (Id.).

8

On October 12, 2011, Nelson reported to the NYSP Office of Human Resources ("HR") that he had been reassigned, contrary to the treatment of any of the Caucasian investigators who had worked under Bennett. (Id.). Shortly thereafter, NYSP Senior Investigator Jerome John confirmed that no other investigator had been moved, including Investigator Campos, who was the Troop K evidence custodian and who had just one month earlier been found to have been derelict in her evidence-handling duties. (Id.). In November 2011, John concluded that reassigning the only minority Troop K investigator gave "the appearance that he is being treated differently than other investigators." (Ex. 7 at p. 12).

In the course of investigating Nelson's complaint of race discrimination, John investigated the investigation of plaintiff. (Ex. 28 at 19:17-20:24). Among many discrepancies, John searched Bennett's SP Hawthorne desk in May 2012, a year after Bennett had left, and found case files buried deep in a void at the bottom of one the desk drawers. (Id. at 42:13-45:25; Ex. 7 at p. 23 (noting that "this void was capable of housing much more evidence than 4.8 ounces of cocaine")). After he started to dig into the surrounding circumstances and found evidence that Nelson was discriminated against because of his race, John was removed from investigating Nelson's complaint without any explanation. (Ex. 28 at 12:18-16:19; Ex. 26 at 691:17-693:3). D'Amico testified that he believed that John had acted outside of the scope of his investigation. (Ex. 23:40-42:12, 44:2-45:12).

In or about March 2012, NYSP's IA Bureau completed its investigation of the missing narcotics which plaintiffs had delivered to SP Hawthorne in July 2010. (Ex. 3). Defendants did not lodge any charges against plaintiffs. (Id). Nor, despite finding significant misconduct by Investigator Campos, did defendants bring her up on disciplinary charges, citing an 18-month statute of limitations for bringing charges. (Id.; Ex. 30 at 59-60; Ex. 23 at 90:15-94:25). However, she had

admittedly destroyed evidence without written authorization and piecemeal–both in direct contravention of standard operating procedure–on November 15, 2010, which is within 18 months of March 30, 2012. (Id.). She had also clearly not told the truth in her IA statements in September 2011 and August 2012 as to why she took the knife and bag for destruction and not the drug evidence from the same case, alternatively asserting that she thought the drugs were at MHRCL or at SP Tarrytown. (Exs. 9, 10). Although Campos' interrogator, IA Capt. Lisa Loughran, who was friendly with Campos, did not probe during those IA interviews regarding Campos' nonsensical, self-contradictory responses, she misrepresented the truth about matters of material importance, and she violated policy in significant ways. (See Id.). Yet, defendants turned a blind eye to Campos' egregious errors and lack of credible answers and neither brought charges against her nor, when D'Amico subsequently ordered a new investigation by the NYSP's counsel's office into the missing drug evidence, focused at all on her actions. (Ex. 23 at 94:9-25).

In November 2012, as Nelson's work situation had not been regularized and he continued to be marginalized and denied the opportunity to perform his job functions despite the March 2012 completion of the NYSP investigation, he filed a SDHR charge of race discrimination. (Shevlin Decl., Ex.F; Ex. 12). In his charge, Nelson identified Lyons as a key supportive witness. (See Ex. 36 at p. 13 of SDHR Complaint form (listing Lyons first among witnesses who could support Nelson's claims of race discrimination)).

During the SDHR investigation into Nelson's complaint and the prior internal EEO investigation by Jerome John, plaintiff Lyons supported Nelson's claim that he had been subjected to disparate treatment and racial discrimination. (Ex. 12 at pp.5-6 (noting that Lyons–identified as

10

"Witness 5" by the SDHR but clearly Lyons based on the witness description–strongly supported Nelson's claims of disparate treatment based on his race); Ex. 22 at 56:25-57:23).

In early March 2013, D'Amico charged plaintiffs with failing to comply with a lawful directive by providing false statement during NYSP's internal investigations of the missing narcotics which plaintiffs had delivered to SP Hawthorne in July 2010. (Ex. 35, 36).[2] In response, on March 27, 2013, plaintiff Nelson resigned because he had been subjected to 30 months of disparate treatment, reduced responsibilities and false accusations and did not foresee his employment status improving. (See Ex. 21; Ex. I).

Plaintiff Lyons did not resign and on April 17, 2013, defendant D'Amico appointed a three-person Hearing Board to consider the evidence against him on the belated charges that he had made false statements concerning his activities on July 28, 2010. (Harford Decl., Ex. E). The panel met for eleven hours on May 2, 2013. (Id.). On May 8, 2013, the Board issued its recommendation that Lyons be suspended without pay for 60 days. (Id).

On or about May 13, 2013, plaintiff Lyons provided a witness statement to SDHR as part of its ongoing investigation of Nelson's race discrimination charge. (Ex. 12 at pp.5-6). Lyons' statement attested to the racial discrimination to which Nelson had been subjected. (Id.).

On May 15, 2013, the SDHR issued a determination of probable cause on Nelson's discrimination charge and specifically referenced Lyons' statement in finding probable cause. (Id.). The SDHR's probable cause determination specifically noted that Lyons was "Complainant's [Nelson's] witness" and that Lyons had "indicated that Complainant was treated differently than

---

[2] In addition, in stark contrast to defendants' application of the 18-month disciplinary rule, they charged Nelson with alleged violations of procedure that occurred in 2008, some five years ago before charges were issued. (See Ex. 35 at pp.2-5, Charges I-III).

White employees." (Id. at pp.5-7)  According to D'Amico, he would have received notice of the decision and its contents on or about May 15, 2013.  (Ex. 23 at 109:2-110:21; Ex. 12; compare Ex. 12 at 51:19-55:13; See Exs. 16, 17 (reflecting that D'Amico received, through NYSP counsel, the SDHR Division's No Probable Cause Determination regarding a SDHR charge brought by Lyons on June 16, 2014, the *same day* that SDHR issued the Determination)).

As of May 30, 2013, defendant D'Amico knew that, through his statement to the SDHR, Lyons had strongly supported Nelson's charge of race discrimination. (See Id.).  On or about May 30, 2013, D'Amico drafted and conveyed to subordinates a document terminating Lyons' employment with the NYSP despite the recommendation of the three-person panel which he had appointed that Lyons be suspended for 60 days, but not terminated. (Ex. 13; D'Amico Decl. Ex D). Over his six years as the NYSP Superintendent, out of dozens of hearing board cases, this was the first and only time that D'Amico overrode a disciplinary hearing panel's recommendation of a penalty less than termination to termination. (Ex. 38; Ex. 23 at 47:22-51:13, 107:5-21; Ex. 13). On May 30, 2013, at D'Amico's direction, Lyons' superior officer called Lyons to a meeting, handed him the memorandum from D'Amico terminating him and told Lyons that he had ten minutes to decide whether to accept this recommendation of termination or resign on the spot. (Id.; D'Amico Decl., Ex. D; Ex. 22 at 72:4-76:4).  Faced with that Hobson's Choice, Lyons resigned.  (Id.).

Other than Nelson and Lyons, no one else was punished in connection with the unprecedented evidence failures and malfeasance at SP Hawthorne.  (See Ex. 27 at 137-38). Defendant D'Amico acknowledged as much at his deposition:

> Q.     Other than Trooper Lyons and Investigator Nelson, was anyone else to your knowledge disciplined in connection with the problems relating to evidence at Troop K?

12

A.    I don't know. I don't believe so.

(Ex. 23 at 21:15-23)

In fact, the two Lieutenants with oversight responsibility for SP Hawthorne, Chiumento and Murphy, were promoted to Captain after this extraordinary supervisory failure–allowing a NYSP Senior Investigator to apparently *steal drug evidence* and otherwise "actively mismanage" evidence for several years–came to light. (Id. at 23:14-25; Ex. 26 at 794:9-799:15; Ex. 33; Ex. 6 at p. 6).

**D.    Other Evidence of Discrimination and Retaliation**

D'Amico determined that he would only impose termination on Nelson and Lyons, even overriding the hearing panel to do so with respect to Lyons for the first and only time in his tenure as Superintendent. (See Ex. 23 at ; Ex. 13). Yet, other NYSP members, including both investigators and troopers, committed a wide range of serious misconduct–ranging from participating in prostitution parties and lying about it, committing DWI and lying about it, committing domestic assaults, making false entries regarding leave time, making racial slurs on Facebook, harassing former romantic partners, being publicly intoxicated and making threats at a casino–without losing their jobs. (See Watkins Aff. ¶ 3).[3]

Finally, according to former SDHR judge Migdalia Pares, she was removed from Nelson's SDHR case after the hearing had concluded due to pressure from the NYSP on the SDHR to have her removed. (Ex. 29 at pp. 39:18-44:23, 51:10-61:24, 70:6-80:24, 84:9-21, 92:24-93:21, 133:22-134:9, 160:19-162:22). According to Pares, NYSP's counsel did so through the Governor's office.

---

[3] Because the underlying disciplinary files regarding these other NYSP members are voluminous, and confidential, plaintiff's counsel has summarized their contents in his Affirmation, referring to the members involved by their initials. To the extent that Defendant disputes the summary, these disciplinary files can be submitted to the Court.

(Id.). This was done without notice to Nelson's counsel, and it was apparently done by the NYSP because it was fearful of an unfavorable decision from Judge Pares. (Id.).

## III.    ARGUMENT

### POINT I

### NELSON'S RACE DISCRIMINATION CLAIMS SHOULD BE TRIED

Defendants argue that Nelson's Title VII claim against the NYSP for race discrimination must be dismissed because: (1) there was no adverse action, (2) he has not raised an inference of discrimination, and (3) even if he has satisfied those two *prima facie* elements, as a matter of law, he cannot persuade a trier of fact that he was discriminated on the basis of his race.

#### A.    Nelson Was Subjected to Adverse Action

When viewed in Nelson's favor, the evidence reflects that he was subjected to an adverse action, namely a materially adverse diminution of duties which resulted in both a steep reduction in overtime pay and the loss of professional stature within the Division, and subjected him to ridicule and disdain from his peers. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) ("A plaintiff suffers an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."); Preda v. Nissho Iwai Am. Corp., 128 F.3d 789, 791 (2d. Cir. 2007) ("The prohibition against discrimination is not limited to pecuniary emoluments, but includes discriminatorily-motivated diminution of duties."); Agard v. New York State Dep't of Taxation & Fin., 2012 WL 601474, at *7 (E.D.N.Y. Feb. 23, 2012) ("[R]eductions in workload and inferior or less desirable assignments constitute adverse employment actions because they impact a plaintiff's opportunity for professional growth and career advancement.").

The standard for assessing whether a reduction in duties is materially adverse "is an objective, rather than a subjective one . . . [and it] depends upon the circumstances of the particular case and should be judged from the reasonable person in the plaintiff's position, considering all the circumstances." Kessler v. Westchester Cty. Dept' of Soc. Svcs., 461 F.3d 199, 209 (2d Cir. 2006). In other words, "context matters" with respect to whether an undisputed reduction of duties, as here, is materially adverse.

Nelson has adduced evidence that, throughout 2012 and up to the end of his employment in 2013, he suffered a significant reduction in responsibilities as a NYSP Investigator. He was prohibited from handling evidence, could not enter the BCI evidence locker, could not adopt new cases, and his work as an investigator on existing cases was significantly curtailed.[4]

That adds up to a materially adverse reduction in duties and responsibilities. Defendants seem to acknowledge as much when they attribute his steep decrease in overtime hours in 2012 to the fact that he was prohibited from picking up new cases and had a diminished case load. (Defs' Brief at p. 16). Nelson went from being a very active investigator, with several years of experience who was highly regarded by his peers, to an investigator who could not take on new cases or handle evidence in existing cases. To the extent that there is any question of fact, it should be decided by the trier of fact. See Preda, 128 F.3d at 791 (2d Cir. 1997) (issue of material fact on question of adverse action raised by plaintiff who 'was excluded from all departmental meetings and outings" and whose "position was reduced to largely clerical tasks").

---

[4] Defendants suggest that Nelson was only prohibited from entering the evidence locker *alone* and that this was equivalent to a limitation imposed on other Troop K investigators. (See Defs' Brief at p. 19). They offer no evidence for this assertion, and it is directly belied by Nelson's own testimony (Ex. 21 at 112:7-16).

## B.    A Jury Can Find Race Discrimination

Defendants argue that no reasonable jury could conclude that Nelson was subject to disparate treatment on the basis of his race. Yet, the NYSP's own EEO investigator, Jerome John, came to that very conclusion after reviewing the evidence involving the missing drug evidence, the NYSP's investigation of same, and its treatment of Nelson. A jury may reach the same conclusion.

First, on this motion, defendants seek to minimize the extraordinary circumstances surrounding the BCI evidence issues at SP Hawthorne. While singling out Nelson (one of the only African-American BCI investigators)for adverse treatment, defendants knew that the Senior Investigator at SP Hawthorne–who maintained control over evidence stored there–had likely *stolen drug evidence* in another case and, for several years, "actively mismanaged" BCI cases and evidence. (See Ex. 33; Ex. 6 at p. 6). They also knew that there were many cases, involving many investigators, involving unaccounted for evidence, evidence that had been destroyed without authorization, case files missing, and the unit "in a total state of disarray." (Ex. 34). In addition, they knew that the video evidence, which would conclusively establish whether Nelson was at SP Hawthorne on July 28, 2010 as he claimed, and which should have existed, was either missing or extremely corrupted. (See, e.g., Ex. 23 at 65:25-69:21; Ex.28 at 62:9-64:13).

Against that backdrop, defendants' less favorable treatment of Nelson compared to other white BCI investigators, including Shannon Morrison (who was involved in the 98 missing Oxycodone pills case) and particularly Troop K's Evidence Custodian, BCI Investigator Evelyn Campos, stands in marked contrast. That was the conclusion that Jerome John reached; it was also the conclusion reached by BCI Senior Investigator, Joanne Leoni, who temporarily switched

16

assignments with Bennett in late May 2011 through his retirement in August 2011, and then returned as Senior Investigator at SP Hawthorne in February 2012. (See Exs. 7, 8, 26, 28).

According to her own testimony, and the surrounding evidence, Campos departed from protocol in several significant ways when, at Sr. Investigator Bennett's behest, she removed the knife and bag from Hawthorne on September 27, 2010, along with the "General 2" Evidence Record for the case. First, because Bennett allegedly called in sick, Campos took evidence from SP Hawthorne for destruction without Bennett being present; she had *never* done that before. Second, she took that evidence for destruction without any written authorization for it to be destroyed. She testified that this was the only time she ever did so, although NYSP's audits showed she had and she also had not recorded destroying    evidence which she should have destroyed, thus leading to "missing/unaccounted for" evidence. (See Pltfs' Rule 56.1 Counter-Stmt at Nos. 15-30).

Third, Campos took the knife and bag for destruction without, according to her, also taking the marijuana and cocaine evidence for destruction. This was also a departure from procedure. While she claimed the drug evidence was not at Hawthorne when she took the other evidence, if that were truly the case, she should have made inquiries about where it was. Yet, she did not do so. She claimed that she thought the drug evidence was still at the MHRCL. However, that explanation does not make sense in light of the fact  the General 2 form clearly reflected that Nelson had brought the drug evidence to the "BCI Evid. [locker]" two months earlier. Finally, Campos took the only copy of the General 2 form with her from SP Hawthorne, meaning that if the drug evidence had been at SP Hawthorne, there would be no evidence record left there to reflect that. (Id.).

17

Notwithstanding these extremely suspicious actions, and her inability to account for them, Campos was spared *any* adverse treatment and remained in her position as Troop K Evidence Custodian as though she had done nothing wrong.

Defendants argue that Campos was not brought up on disciplinary charges because her infractions occurred outside the 18-month rule. First, this does not address why she suffered no other diminishment of her duties with respect to evidence-handling, as Nelson did. Moreover, it simply does not add up. Campos' numerous, blatant violations of standard operating procedures were known as of fall 2011 and were documented in reports generated in February and March 2012. (See Exs. 1-3). She destroyed the knife and bag without written authorization on November 15, 2010, which was less than 18 months before March 30, 2012–there was no time bar to charges. (Ex. 3 at pp. 5, 10). Moreover, she was questioned by IAB about her actions in September 2011 and August 2012 and offered nonsensical, conflicting explanations for her actions. (Exs. 9, 10).

Moreover, defendants claim they could not charge Campos because of the 18-month rule and yet, in March 2013, they proffered three charges against Nelson based on alleged infractions dating back to 2008, nearly *five years* before the charges were proffered. (Ex. 35 at pp. 2-5, Charges I-III). That is the very essence of disparate treatment, which in turn "is the essence of discrimination." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

In addition, the Second Circuit recognizes that retaliation for complaining of discrimination is tantamount to race discrimination. See O'Toole v. County of Orange, 2019 U.S. Dist. LEXIS 38001, at *27-28 (S.D.N.Y. Mar. 8, 2019) (NSR) ("Additionally, Plaintiff is correct that, in the context of Title VII, the Supreme Court and Second Circuit have recognized that retaliation for making a sex-based discrimination complaint is a form of sex-based discrimination.") (citing Vega,

801 F.3d at 82; Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005)). As set forth below, Nelson has adduced sufficient evidence from which a reasonable jury may conclude that he was subjected to retaliation for having complained of race discrimination. That evidence also supports a jury finding that he was discriminated against.

Finally, a jury may consider the fact that defendants removed Investigator John from Nelson's EEO complaint without explanation after he found evidence in his favor. Similarly, it may consider the NYSP's highly unusual steps in having SDHR ALJ Pares removed from Nelson's case, in apparent violation of SDHR protocol, after she had overseen several days of hearing but before she issued a recommended order. Both sets of facts lend support to Nelson's claim.

## POINT II

### PLAINTIFFS' RETALIATION CLAIMS SHOULD BE TRIED

Defendants argue that: (1) Nelson did not suffer any adverse action; (2) D'Amico was unaware of any protected activity by plaintiffs before taking any adverse action against them; (3) Lyons did not suffer any adverse action; and (4) neither plaintiff can establish a causal connection between protected activity and adverse action. (Defs' Brief at pp. 17-25).

### A.    Defendants Subjected Both Plaintiffs to Adverse Actions

The Supreme Court Set forth the adverse action standard in retaliation cases in Burlington Northern & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006): "[a retaliation plaintiff] must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." In adopting this standard, "[t]he Court rejected the proposition that an actionable act of retaliation must relate to the specific terms and conditions of the employee's employment, and

19

construed 'materially adverse action' broadly to include changes in employment life outside of the terms and conditions of employment." Millea v. Metro-North R. Co., 658 F.3d 154, 164 (2d Cir. 2011). In addition, "alleged acts of retaliation must be evaluated separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2012).

Under these standards, there can be no serious question that both plaintiffs were subjected to adverse actions. Indeed, as to Lyons, he was subjected to the ultimate adverse action, termination. It has long been established that being given the option to either resign or be terminated, which the parties do not dispute is what occurred, is equivalent to being terminated. See, e.g., Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188-89 (2d Cir. 1987); Leitgen v. Franciscan Skemp Healthcare, Inc., 630 F.3d 668, 673 (7th Cir. 2011) (noting that where the employee was told that "she could either resign or be fired[,]" the employee's "forced resignation constitutes an adverse employment action"); Doria v. Cramer Rosenthal McGlynn, Inc., 942 F. Supp. 937, 947 (S.D.N.Y. 1996) ("The most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge."). The Pressley case cited by defendants is inapposite, because the plaintiff there resigned while her transfer request was still pending. Pressley v. City of New York, 2015 U.S. Dist. LEXIS 177381, at *28 (E.D.N.Y. Aug. 27, 2015) ("At the time of Plaintiff's exit she did not know, and would never know, whether Defendants would have granted or rejected her transfer request, such that it cannot amount to an adverse employment action.").

As for Nelson, given that he filed his internal complaint of race discrimination in October 2011, the same timely adverse actions with respect to his discrimination claim also apply to his retaliation claim. See Patane v. Clark, 508 F.3d 106, 116 (2d Cir. 2007) (under White, "Title VII's

20

anti-retaliation provision is broader than that of its discriminatory action provision"); Mazyck v. Metro. Transp. Auth., 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012).

In addition, a reasonable jury may conclude that defendants' second investigation of the missing drug evidence–which focused exclusively on plaintiffs and was unprecedented–constituted an adverse action. A jury may conclude that the investigation was a predetermined and single-minded attempt to support disciplinary charges against plaintiffs which, if retaliatory, would likely deter a reasonable employee from engaging in protected activity.

Finally, defendants are wrong that, because Nelson resigned, the charges against him are not an adverse action. The case they cite, Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) was a discrimination case, and the quote used is *dicta* and, more importantly, inapposite to plaintiffs' retaliation claims. See Broich v. Inc. Village of Southampton, 462 Fed. App'x 39, 47 (2d Cir. 2012) (Summary Order) ("[T]he initiation of disciplinary charges leading to an administrative hearing permitting 'suspension with pay and carr[ying] with it the threat of possible termination' constitutes adverse employment action"); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004) (disagreeing with the district court's conclusion that the maintenance of disciplinary charges did not constitute an adverse employment action where the charges against plaintiffs were dismissed after a hearing, and any loss of pay suffered by plaintiffs was reinstated). Because the disciplinary charges, if retaliatory, would likely deter a reasonable employee from complaining of discrimination, they constitute an adverse action. See White, 548 U.S. at 68.

## B.    Plaintiffs Engaged in Known Protected Activity

Defendants do not dispute that Nelson engaged in protected activity under both Title VII and 42 U.S.C. § 1981 (made actionable against D'Amico under 42 U.S.C. § 1983) when he filed an

internal complaint of race discrimination in October 2011 and an SDHR complaint of discrimination in or about November 2012. Nor do they argue that Lyons did not engage in protected activity under § 1981 or the First Amendment, both made actionable against D'Amico under § 1983, by supporting Nelson's claim of race discrimination in the internal EEO investigation and subsequent SDHR investigation. Instead, they argue that D'Amico was not aware of plaintiffs' protected activity and that certain adverse actions occurred prior to plaintiffs' protected activity. Their arguments rely on a disputed record and raise questions of fact, and credibility, which a jury should resolve.

As to Nelson, a reasonable jury may readily conclude that, despite his protestations, D'Amico was well aware that he had filed an internal EEO complaint of race discrimination, as well as an SDHR discrimination charge. Indeed, when the evidence is viewed in Nelson's favor, a jury may conclude that John was removed from the EEO investigation in May 2012 at D'Amico's direction. D'Amico admitted believing that John had overstepped his authority, and that he did not approve of John searching Bennett's old SP Hawthorne desk, even though John discovered previously overlooked case files buried there.

A jury may similarly conclude that D'Amico was aware of the SDHR complaint and that it influenced his decisionmaking. As D'Amico is a party and party representative, his assertions regarding his purported lack of knowledge of Nelson's discrimination complaints, many of which are directly contradicted by other evidence, carry no weight. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000). Moreover, for purposes of Nelson's Title VII relation claim (which is only against the NYSP), there is no dispute that the NYSP knew of his discrimination complaints.

As for the timing of the second investigation, defendants have not presented any conclusive evidence that D'Amico initiated it before Nelson's November 2012 SDHR complaint. That remains

a disputed issue of fact. In any event, D'Amico had long known of Nelson's internal EEO complaint and, even if he was not aware of Nelson's SDHR complaint before starting the second investigation, a jury can still find close temporal proximity because, according to defendants, IAB did not conclude that it lacked a sufficient basis to charge Nelson until August or September 2012. D'Amico could have been waiting that out for the outcome before launching an unprecedented investigation by NYSP Counsel's office to get his desired result due to retaliatory animus.

As for Lyons, the evidence also contradicts D'Amico's claims of ignorance. A reasonable jury may readily conclude that he was aware that Lyons was supporting Nelson's internal complaint of discrimination and was identified as a key supportive witness in the SDHR complaint. As to Lyons' termination, according to D'Amico's own deposition testimony, he would have received Nelson's May 15, 2013 SDHR Probable Cause Determination on or about that date. That Determination relied on Lyons' SDHR statement to find against the NYSP. Just two weeks later, D'Amico overrode the Lyons Hearing Panel's penalty recommendation in favor of termination – the first and only time he did so as Superintendent.

## C. A Reasonable Jury May Find Causation

"[P]articularly at the summary judgment stage, courts allow causation to be shown through a consortium of indirect evidence–often through indicia of temporal proximity, the context of surrounding events, disparate treatment between different employees, and general inconsistencies with the employer's proffered reasons for [the adverse action]." O'Toole, 2019 U.S. Dist. LEXIS 38001, at *35.

Much of the same evidence that supports Nelson's discrimination claim also supports finding a causal connection between his protected activity and the ongoing adverse actions which followed

his protected activity. In addition, even after both EEO Investigator John and the Deputy Superintendent over IAB, Colonel Ellis, noted that Nelson was being unjustly treated as compared to others, particularly Campos, defendants continued to significantly diminish his duties and standing within the Division.

As noted above, a reasonable jury may find that D'Amico ordered John off of Nelson's EEO investigation and it may also find that he did so because John was uncovering evidence that tended to exonerate Nelson. Those facts suggest retaliatory motive–that defendants were less interested in getting to the truth than in punishing Nelson for complaining of discrimination. This is further supported by Ellis' testimony that D'Amico told him not to "lay all the blame on Bennett." That is an extraordinary statement in light of Bennett's blameworthiness. He was found to have likely stolen other drug evidence, probably stole this drug evidence, as Ellis had concluded, and was deemed to have "actively mismanaged" cases and evidence for years for probably nefarious reasons. A jury may conclude that D'Amico wanted Nelson to hang for Bennett's sins because Nelson had dared to complain of discriminatory treatment in the wake of his transfer.

If one needed any more proof, one need only review the March 2013 charges that D'Amico proffered against Nelson. While claiming that Campos was immune from punishment because of the 18-month rule, D'Amico lodged three charges against Nelson based on alleged infractions that had occurred *five years earlier*. That type of glaring inconsistency smacks of retaliatory animus.

As for Lyons' termination, the temporal proximity of two weeks, could not be much tighter. D'Amico admitted to having received the May 15, 2013 SDHR Probable Cause Determination on or about that date. His averments on this motion of disinterest in those proceedings not only contradict his deposition testimony, they contradict his own emails regarding the No Probable Cause

24

Determination the SDHR issued on Lyons' retaliation charge in June 2014. D'Amico received a copy of the Decision the day that it issued and then sent out a congratulatory email that he was "Sure glad I hired that guy," referring to the Division's Chief Counsel. (Ex. 16). Far from disinterest, the email chain reflects an intense interest in the SDHR proceedings, and he likely expressed as much resentment at the May 2013 Probable Cause Determination as he expressed joy at the June 2014 No Probable Cause Determination. A finding of race discrimination by the Division, especially in connection with the highly publicized Troop K evidence disaster, would look terrible for D'Amico. This may explain why his counsel covertly had Judge Pares removed from Nelson's SDHR case before she could issue a decision.

Beyond temporal proximity, Lyons may rely on much of the same evidence of disparate treatment as Nelson. As Senior Investigator Leoni, and Judge Pares, noted incredulously, only he and Nelson suffered any punishment with respect to the years-long evidence debacle at SP Hawthorne under Bennett and his supervisors, Lts. Chiumento and Murphy, both of whom were promoted to Captain.

In addition, it was unprecedented for D'Amico to override the Hearing Board in favor of termination. He did so despite having given Lyons two awards for outstanding police work the year before. These facts also tend to show that D'Amico terminated Lyons out of retaliatory bias because of Lyons' integral support of Nelson's complaints of race discrimination.

In addition, plaintiffs have adduced evidence that other NYSP members, both troopers and investigators, committed serious infraction, and in some cases violated the N.Y. Penal Law, that were as serious as Nelson and Lyons allegedly did, and yet escaped termination and in some cases received a mere slap on the wrist. (See Watkins Aff. ¶ 3). Whether these more favorably treated

members were similarly situated to plaintiffs is a question of fact. See McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (an employee's situation need be "sufficiently similar to plaintiff's to support at least a *minimal inference* that the difference in treatment may be attributable to retaliation.") (emphasis added). Suffice it to say, a reasonable jury may conclude that these individuals, none of whom had made a complaint of discrimination or supported another member's complaint of discrimination, were similarly situated to plaintiffs and were treated more favorably.

Finally, as to Lyons, defendants suggest that his claim might be barred because the Third Department denied his Article 78 petition challenging his termination. This Court already correctly ruled that "[b]ecause Lyons' retaliation claim was not necessarily decided by the Third Department, he cannot be estopped from pursuing that claim here." (Dkt Entry No. 25 at p. 19). In addition, as Lyons was denied video evidence to use at his hearing which tended to exonerate him, he was denied a full and fair opportunity to litigate any issue and collateral estoppel is inapplicable. See PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004).

## IV.   CONCLUSION

For the foregoing reasons, and all of the pleadings and proceedings had herein, this Court should deny defendants' motion.

Dated: Goshen, New York
       March 15, 2019

Respectfully submitted,

S/ _____
Christopher D. Watkins (CW 2240)
SUSSMAN & ASSOCIATES
1 Railroad Ave. – PO Box 1005
Goshen, NY 10924
(845) 294-3991
*Attorneys for Plaintiff*

26