```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/2/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAMUS LYONS and NOEL NELSON,

                              Plaintiffs,

        -against-                                                    15 Civ. 3669 (NSR)
                                                                     OPINION & ORDER

STATE OF NEW YORK, DIVISION OF POLICE
and JOSEPH D'AMICO, in his individual capacity,

                              Defendants.

NELSON S. ROMÁN, United States District Judge:

        Plaintiffs Seamus Lyons ("Lyons") and Noel Nelson ("Nelson") (together, "Plaintiffs")

commenced this action on May 12, 2015 against Defendants the State of New York, Division of

Police ("NYSP") and Joseph D'Amico ("D'Amico") (together, "Defendants"). (ECF No. 1.)

Plaintiff Nelson asserts racial discrimination and retaliation claims in violation of his rights

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 ("Title VII"), as

well as a retaliation claim under the Free Speech clause of the First Amendment to the United

States Constitution, pursuant to 42 U.S.C. § 1983 ("Section 1983"), and both Plaintiffs bring

causes of action for retaliation pursuant to 42 U.S.C. § 1981. (See Third Amended Complaint

"TAC", ECF No. 26.)

        Presently before the Court is Defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56 (the "Defendants' Motion") (ECF No. 75). For the following

reasons, Defendants' Motion is GRANTED in part and DENIED in part.

## BACKGROUND

        All facts are taken from the Defendants' Rule 56.1 Statement of Undisputed Material

Facts ("Defs. 56.1") (ECF No. 77), Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts

Reply ("Plfs. Resp.") (ECF No. 85), Plaintiffs' Rule 56.1 Counter-Statement ("Plfs. Cntr.")

(ECF No. 85), the parties' affidavits, declarations, and exhibits, and are uncontested except

where indicated.  All rational inferences are drawn in Plaintiffs' favor.  *See Kirkland v.*

*Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).

## I.   Plaintiffs and Other Relevant NYSP Employees

Plaintiff Noel Nelson worked for more than twenty-seven years for the NYSP.  (Plfs.

Resp. ¶ 2.)  He was hired as a NYSP Trooper in 1984 and promoted to Investigator in 1990.

(Plfs. Resp. ¶ 2; Affirmation of Christopher D. Watkins ("Watkins Aff."), ECF No. 86, Ex. 21 at

10:7–9; 14:24–15:3.)  Nelson is African-American.  (Plfs. Resp. ¶ 2.)

Plaintiff Seamus Lyons worked for the NYSP for approximately 12 years as a Trooper.

(Plfs. Resp. ¶ 1.)  He is Caucasian.  (*Id.*)  Both Nelson and Lyons received awards for their work

with the NYSP.  (Watkins Aff., Ex. 21 at 14:3–15:3; 28:8–24; Ex. 23 at 119:6–122:6.)

In 2010, Nelson served as an Investigator with the Bureau of Criminal Investigations

("BCI").  (*See* Plfs. Resp. ¶ 2.)  The Senior Investigator responsible for the Hawthorne BCI

evidence locker was Robert Bennett ("Investigator Bennett"), who is Caucasian. (Plfs. Resp. ¶

12; Plfs. Cntr. ¶ 10.) Investigator Evelyn Campos ("Investigator Campos"), who is Caucasian,

was the Evidence Custodian with responsibility for BCI evidence within Troop K, including at

Hawthorne. (Plfs. Cntr. ¶ 11; Watkins Aff., Ex. 30 at 7.)

## II. Missing Evidence and Related Investigations

### a.   Missing Drug Evidence

On July 28, 2010, Plaintiffs were at the Mid-Hudson Regional Crime Lab ("MHRCL") in

Newburgh, New York, when Nelson was asked to transport evidence from MHRCL.  (Plfs. Resp. ¶ 26.)  The parties dispute whether Nelson was asked to transport the evidence to the Hawthorne barracks or the Tarrytown barracks.  (Plfs. Resp. ¶¶ 26, 37.)  According to Nelson, a lieutenant at the lab asked him to return bagged marijuana and cocaine to the Hawthorne barracks.  (Watkins Aff., Ex. 1, Ex. 21 at 34:16–36:7, 59:3–11.)[1]  Subsequently, according to Nelson, he secured the evidence in the Hawthorne barracks' evidence locker and signed it into evidence on a "General 2" "Evidence Record" form.  (Watkins Aff., Ex. 1, Ex. 21 at 56:3–60:9.) According to Defendants, the drugs were never delivered to the Hawthorne barracks.  (*See* Declaration of John P. Harford ("Harford Decl."), ECF No. 81, at ¶¶ 17–19.)  Plaintiffs, however, maintain that the drugs were either destroyed or otherwise disappeared from the Hawthorne evidence locker without having been recorded as removed.  (*See* Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Memo"), ECF No. 84, at 4; Watkins Aff., Ex. 1; Ex. 32.)

On September 27, 2010, according to Investigator Campos, two other items of evidence from the same case—but not the aforementioned drug evidence—were forwarded for destruction.  (See Plfs. Resp. ¶¶ 24–25, 29–30.)  According to Campos, in or about September 2010, Investigator Bennett instructed her to pick up evidence for destruction from the Hawthorne BCI evidence locker.  (Watkins Aff., Ex. 30 at 19:3–21.)  Subsequently, Campos was told that Investigator Bennett called in sick, and Campos proceeded to take the evidence without

---

[1] *See also* Watkins Aff., Ex. 31 at 7:6–8:23 (testimony of Senior Investigator Robert Bennett explaining that evidence for Tarrytown BCI cases would be transported to Hawthorne).

receiving any written instructions that the case was disposed of or that she should remove the evidence for destruction.[2]  (Plfs. Cntr. ¶¶ 18–22.)

According to Campos and the General 2 form, the items that she took for destruction from the relevant criminal case were only Item Nos. 3 and 4: a knife and a "Captain Morgan" bag.[3] (Plfs. Cntr. ¶ 24.)  She did not take Items 1 and 2, the cocaine and marijuana, and she claimed they were not at the Hawthorne BCI locker on September 27, 2010.  (*Id.* ¶ 25.) Campos testified that, even though the General 2 showed that those items had been brought to "BCI Evidence" on July 27, 2010, she thought they might be at the Tarrytown station.[4]  (*Id.* ¶ 26.)

On October 6, 2010, Investigator Bennett reported that he and Lieutenant Chiumento, his BCI supervisor, had inventoried the Hawthorne BCI evidence, during which several clerical errors were noted.  (Watkins Aff., Ex. 4.)  The report did not mention any missing evidence. (*See id.*)  Three months later, on January 5, 2011, Investigator Bennett again reported that he had conducted an inventory, and that "all evidence has been accounted for." (Watkins Aff., Ex. 5.)

In March 2011, the NYSP determined that 98 Oxycodone pills had been stolen from the

---

[2] According to Campos, under standard operating procedure, Investigator Bennett would be present with her to hand her the evidence and answer any questions she had.  (Watkins Aff., Ex. 30 at 20:6–21:5.)  In addition, according to Campos, Nelson, and Joanne Leoni (a BCI Senior Investigator) ("Investigator Leoni"), standard operating procedure dictated that, before taking evidence for destruction, the Evidence Custodian needed written instructions that the case had been disposed and the evidence she was taking was to be destroyed; those instructions were supposed to appear on or be attached to the General 2.  (Plfs. Cntr. ¶ 17.)

According to a February 2012 "Historical Audit" report of Hawthorne BCI, the NYSP determined that, while Campos was Evidence Custodian, "several instances were noted wherein evidence was secured and forwarded for destruction without the authority and instructions for disposition written on a Genl 2 [the "General 2" evidence tracking form]." (Watkins Aff., Ex. 2 at 11.)  A March 2012 SP Hawthorne BCI Unit "Evidence Audit" noted:

"Cases in which Genl. 2 record indicated destroy evidence. Evidence in question not listed as destroyed on Genl. 2. No Destruction memorandums located. Inv. KIM CAMPOS was the Evidence Custodian. Evidence remains missing/unaccounted for." (Watkins Aff., Ex. 3 at 8.)

[3] According to Campos, Nelson, and Investigator Leoni, standard operating procedure dictated that the Evidence Custodian took any remaining evidence from the same closed case at the same time for later destruction. (Plfs. Cntr. ¶ 4 In later statements to Internal Affairs, Campos stated that she believed the two drug items were still at the MHRCL.  (Plfs. Cntr. ¶ 23.)

Hawthorne barracks evidence locker. (Declaration of Kevin Gagan ("Gagan Decl."), ECF No. 79, Ex. C at 2.)  A subsequent investigation concluded that Investigator Bennett was guilty of violating NYSP rules and regulations regarding the maintenance and security of evidence.[4]  (*Id.* at 28.)  In or about August 2011, Investigator Bennett retired. (Watkins Aff., Ex. 26 at 690–91.)

On August 18, 2011, BCI Senior Investigator Matthew Laspisa ("Investigator Laspisa") was transferred to Hawthorne barracks and described Investigator Bennett's office as "in a total state of disarray," with many case files containing "inconsistencies and discrepancies." (Watkins Aff., Exs. 32, 34.)[5]  On September 16, 2011, Investigator Laspisa discovered that case file # 3165705 had drug evidence that could not be accounted for, i.e., the aforementioned bags of cocaine and marijuana transported on July 28, 2010.  (Plfs. Resp. ¶¶ 21–23; Watkins Aff., Exs. 32, 34; Declaration of Kevin Gagan ("Gagan Decl."), ECF No. 79, ¶¶ 46–47 and Exh. F, at 9012; Declaration of Dominick Chiumento ("Chiumento Decl."), ECF No. 78, at ¶ 41); Affidavit of Lisa Loughran ("Loughran Aff."), ECF No. 87, ¶ 8.)

### b. Missing Laptop Evidence

On or about September 26, 2011,[6] Nelson advised Senior Investigator Laspisa that he had concerns about a laptop computer that was secured as part of a suicide case he had

---

[4] The investigation report included the following: "Although S/Inv. BENNETT denied stealing evidence (98 oxycodone pills) from the SP Hawthorne BCI evidence locker, surrounding circumstances strongly suggest that S/Inv. BENNETT did in fact take the drugs. He had motive, opportunity and control of the evidence." (Gagan Decl., Ex. C at 3.)

[5] According to a March 2012 NYSP report regarding Hawthorne BCI evidence, Investigator Bennett "failed to take the administrative action necessary to correct obvious errors, or . . . intentionally manipulated the records pertaining to the collection, recording and storage of evidence." (Watkins Aff., Ex. 2 at 16.)  Another NYSP report from December 2011 concluded that "Senior Investigator Bennett was allowed to ignore his supervisory responsibilities and to actively mismanage his operation at [BCI] Hawthorne." (Watkins Aff., Ex. 6 at 6.)

[6] Shortly thereafter, the NYSP was scheduled to conduct an audit of all Hawthorne barracks BCI cases for the period 2004–2011, *see* Chiumento Decl. ¶ 50, and Nelson was scheduled to give a statement in regard to the missing drugs that same day.  *Id.* at ¶ 52.

investigated in 2008, which was missing.  (Plfs. Resp. ¶ 31; Chiumento Decl. ¶¶ 52–54; Gagan

Decl. ¶¶

41–42 and Ex. D at 3434–3452.)  According to Nelson, he had sent the laptop to Computer

Crimes to be analyzed, but never received it back.  (Plfs. Resp. ¶ 32–33; Gagan Decl. ¶ 42 and

Ex. D at 3434.)  Sometime later, Nelson asked his then-supervisor, Investigator Bennett, what

happened to the computer and was told by Investigator Bennett to not worry about it.  (*Id.*)

Nelson proceeded to close the case file and signed an Incident Report that indicated that no

evidence was outstanding.  (Gagan Decl. ¶ 42 and Ex. D at 3434.)

    After Investigator Laspisa advised his superiors of Nelson's claims regarding the laptop,

Internal Affairs Bureau ("IAB") Inspector Mark Smith ("Inspector Smith") was assigned to

investigate.  (Plfs. Resp. ¶ 35; Gagan Decl. Ex. D at 3434.)  By memorandum dated December

19, 2011, Inspector Smith advised the head of IAB, Deputy Superintendent Colonel Anthony

Ellis ("Colonel Ellis"), of his recommendation that the case be deemed "Founded."  (Plfs. Resp.

¶ 81; Gagan Decl. ¶¶ 44–45 and Ex. D at 3447–3452; Loughran Aff. ¶ 13.)  Inspector Smith

found that Nelson had acted improperly by falsifying a document with respect to the missing

laptop computer, and that Nelson had violated several NYSP Rules, Regulations, and

Instructions, including knowingly making a false entry in official records.  (Plfs. Resp. ¶ 81;

Gagan Decl. ¶¶ 44–45 and Ex. D at 3447–3448 and Ex. E; Loughran Aff. ¶ 13.)  Colonel Ellis

took no action with respect to Inspector Smith's recommendation.[7] (Plfs. Resp. ¶ 82; Gagan

---

[7] On or about December 4, 2012, then-NYSP Assistant Counsel John Harford ("Harford") first learned of Inspector Smith's report that Nelson admitted to filing a false business record in connection with the missing laptop computer.  (Plfs. Resp. ¶ 116; Harford Decl. ¶ 16.)  According to Harford, this investigation would have been referred to the First Deputy Superintendent after Colonel Ellis's review. (Plfs. Resp. ¶ 117; Harford Decl. ¶ 16.) However, the tracking form for this investigative report indicated that it had been in the possession of Colonel Ellis for approximately eleven months, but had never been forwarded to the First Deputy Superintendent for disciplinary action.  (*Id.*)  Plaintiffs dispute this fact and argue Harford should be precluded as a witness. (*See* Plfs. Resp. ¶¶

Decl. ¶ 45.)

### c.   IAB Investigation Into Missing Drug Evidence

After Investigator Laspisa's September 2011 report, the NYSP's IAB unit began an

investigation into the missing drug evidence, which included interviews with both Plaintiffs on

or about September 28, 2011 (Nelson), October 5, 2011 (Lyons), and October 20, 2011 (both).

(*See* Watkins Aff., Ex. 3.; Plfs. Resp. ¶¶ 36–42.)

### i. Plaintiffs' September 28, October 5, and October 20, 2011 Statements

In these interviews, Plaintiffs stated that on July 28, 2010, they went from MHRCL to the

Hawthorne barracks in Lyons' marked vehicle, and upon arriving at the Hawthorne BCI office in

the early afternoon the Plaintiffs saw Investigator Bennett, Investigator Becerra, and two other

investigators.  Plaintiffs stated that the door to the evidence locker was opened when they

arrived, and Nelson delivered the drug evidence into the locker and filled out the General 2 form.

Plaintiffs stated that afterward, they went directly to the Tarrytown barracks.  (See Plfs. Resp. ¶¶

36–42, 66–69 and 74; Gagan Decl. ¶¶ 55–57, 60–61, 67–69, and Ex. F at 9015–9018,

9025–9026.)

At some point during the interviews, Plaintiffs were shown evidence inconsistent with

their statements, including electronic door access records for the BCI evidence locker and EZ

Pass records. (Plfs. Resp. ¶¶ 43, 58–77; Gagan Decl. ¶¶ 57 and 61–69 and Ex. F at 9016–17,

9018, 9020–9021, 9024–9027.)  In response, Plaintiffs defended their version of events, though

Nelson acknowledged that it was possible that they did not take the drug evidence to the

Hawthorne barracks on July 28, 2010, but, instead, took it to the Tarrytown barracks.  Nelson

---

100, 116.)  Plaintiffs also note that any potential charges related to the laptop would have been past the 18-month
statute of limitations for discipline. (*See* Plfs. Resp. ¶ 117; Watkins Aff., Ex. 35 at 2–5.)

also stated that the electronic door was prone to malfunctioning, and therefore, the access records could not be trusted. (*See* Plfs. Resp. ¶¶ 44-45, 76–77; Gagan Decl. ¶¶ 57, 61 and 69 and Ex. F at 9015, 9018, 9027.)

### ii.    Nelson's Transfer

On or about September 30, 2011, Nelson was directed by Captain Lisa Loughran ("Captain Loughran"), the Captain assigned to the BCI in Troop K, to begin reporting to the Hawthorne barracks, rather than the Tarrytown barracks, effective October 3, 2011, under the supervision of Investigator Laspisa, who was stationed there.  (Plfs. Resp. ¶ 46; Chiumento Decl. ¶ 58; Loughran Aff. ¶ 16; Watkins Aff., Ex. 7 at 15.)

When Nelson started working at Hawthorne, he was placed on an administrative assignment and was directed to get all of his case files in order. (Plfs. Resp. ¶ 49; Loughran Aff. ¶ 20.)  Although Nelson was transferred, he continued to have the use of an official State Police vehicle, gas card, parking placard, and EZ Pass transponder.  (Plfs. Resp. ¶ 51; Chiumento Decl. ¶ 60.)  According to Nelson, however, NYSP stripped him of part of his jurisdiction as an investigator,[8] disallowed him access to the Hawthorne evidence locker, and curtailed his regular overtime pay.  (Watkins Aff., Ex. 21 at 107:14–113:24.)  Nelson was not authorized to handle evidence or take on new cases.  (Plfs. Resp. ¶ 50.)[9]  NYSP did not take any similar action against Lyons.  (Watkins Aff., Ex. 21 at 109:19–24.)

---

[8] Defendants contend that Nelson was never stripped of his jurisdiction as an Investigator.  (*See* Plfs. Resp. ¶ 51; Chiumento Decl. ¶ 60.)

[9] The parties dispute the reason for this. Defendants argue that the decision was justified by Nelson's involvement with the missing cocaine and marijuana, and the numerous cases that he had to close.  (Loughran Aff. ¶¶ 20 and 23–25.)  Plaintiffs deny that Nelson made any false statement or should have been singled out in this manner, citing Colonel Ellis and Investigator John's assessments. (Watkins Aff., Ex. 28 at 19:16–20:24, 51:21–52:23, 73:16–78:11, 80:12–81:19, 91:2–92:8, 95:13–96:13; Ex. 7 at 14–15 ("However, Inv. NELSON, the only minority member, was reassigned from SP Tarrytown to SP Hawthorne giving the appearance that he is being treated differently than other investigators. Colonel ELLIS agreed with this assessment and indicated that he would advise Field Command that IAB had no reason to support Inv. NELSON's continued re-assignment to SP

### iii.    Nelson's HR Complaint

On October 12, 2011, Nelson lodged an internal complaint of race discrimination with the NYSP Office of Human Resources ("HR"), which was handled by NYSP Senior Investigator Jerome John ("Investigator John"), who had oversight of investigating internal EEO complaints. (Plfs. Cntr. ¶ 44; Watkins Aff., Ex. 7 at 15.)  On or about October 17, 2011, Investigator John confirmed that no other investigator who worked under the supervision of Investigator Bennett—all of whom are Caucasian—had been reassigned. (Watkins Aff., Ex. 7 at 15.)

In November 2011, Investigator John conveyed his initial findings to Colonel Ellis, noting that reassigning the only minority Troop K investigator gave "the appearance that he is being treated differently than other investigators."[10] (Watkins Aff., Ex. 7 at 12–13.)

### iv.    Plaintiffs' December 28, 2011 Statements

On or about November 25, 2011, the NYSP reviewed cell phone records for Nelson and Lyons, which demonstrated that on July 28, 2010, Nelson was in contact with Investigator Skyler King ("Investigator King") in the Middletown area in the late morning/early afternoon; and that Lyons was in the Middletown area at 12:01pm and in the Nyack area at 1:11pm. (Plfs. Resp. ¶¶ 78–80; Gagan Decl. ¶ 70 and Ex. F at 9028–9029.)

---

Hawthorne at this time and that he would request that Field command return Inv. NELSON to his original assignment at SP Tarrytown.")).

[10] In May 2012, Investigator John searched Investigator Bennett's desk at BCI Hawthorne and found case files in a void at the bottom of one the desk drawers. (Watkins Aff., Ex. 28 at 42:13-44:25; Ex. 7 at 23; Ex. 26 at 691:17–693:3.)  Investigator John was subsequently removed from investigating Nelson's complaint, but stated he did not receive an explanation for his removal. (Watkins Aff., Ex. 28 at 12:18–16:19.)  Superintendent D'Amico later testified that he believed that Investigator John had acted outside of the scope of his investigation. (Watkins Aff., Ex. 23 at 40:18–42:12, 44:2–45:12.)  Defendants note that because Nelson filed a complaint with the NYSDHR on or about November 16, 2012, the EEO investigation was terminated pursuant to NYSP policy.  (Gagan Decl. ¶ 86.)

On December 28, 2011, Plaintiffs appeared for separate third compelled statements. (Plfs. Resp. ¶ 83.)  Before these interviews, IAB Captain Brendan Casey ("Captain Casey") called Nelson and told him that the cell phone records had shown that Nelson and Lyons had been in Middletown, New York after leaving the MHRCL in Newburgh. (Watkins Aff., Ex. 21 at 81:14-20, 96:4–99:9.)  Upon learning of the cell phone records, Nelson and Lyons stated that their recollection had been refreshed.  (*Id.*; Plfs. Resp. ¶ 83; Gagan Decl. ¶¶ 71–72 and Ex. F at 9030–9031.)  According to Plaintiffs, upon leaving the MHRCL, they did not go directly to the Hawthorne barracks.  Instead, they went to meet Investigator King to interview a witness in another case.  (Plfs. Resp. ¶ 84; Watkins Aff., Ex. 21 at 96:4–99:9; Gagan Decl. ¶¶ 71–72 and Ex. F at 9030–9031.)  Plaintiffs stated that afterward, they purchased pies from a farm stand and then proceeded down Route 17 to the New York State Thruway directly to Hawthorne where they delivered the drugs.  (*See* Plfs. Resp. ¶ 85–86; Gagan Decl. ¶¶ 71–72 and Ex. F at 9030–903.1.

At some point after the December 28, 2011 interviews, Inspector Smith was informed by Chief Technical Sergeant Ira Promisel ("Sergeant Promisel") that if the BCI evidence locker door at the Hawthorne barracks had been opened on July 28, 2010, an electronic record would have been created, but that no such record existed.  In addition, Sergeant Promisel stated that while the film from the CCTV security cameras at the Hawthorne barracks for July 28, 2010, was partially corrupted, the portions that were not corrupted failed to verify that the plaintiffs were present.[11]  (*See* Plfs. Resp. ¶¶ 88–90; Gagan Decl. ¶¶ 73–74, 76, and Ex. F at 9032, 9035.)

---

[11] As part of the NYSP Office of Human Resources investigation, Investigator John reviewed the videotape of the Hawthorne barracks from July 28, 2010 and observed that video showed a marked Chevy Tahoe—the same type of car driven by Lyons on that date—leaving the barracks' parking lot in the early afternoon. (Plfs. Cntr. ¶¶ 44–46; Watkins Aff., Ex. 7 at 15.)

### d. IAB Inspector Smith's Findings

In a March 2012 internal report of the NYSP investigation, Inspector Smith determined that the Troop K evidence custodian, Investigator Campos, transferred Item Nos. 3 and 4—the knife and "Captain Morgan" bag—to the Poughkeepsie barracks and destroyed that evidence "without appropriate authorization" on November 15, 2010 and, by so doing, "failed to exercise diligence in the performance of her duties." (Watkins Aff., Ex. 3, at 5, 10.)  That same report noted that the evidence that Nelson reported he transported to the Hawthorne barracks on July 28, 2010 "remains missing/unaccounted for."  (Watkins Aff., Ex. 3, at 5, 10.)  The report did not include any explanation for the loss of the evidence, nor did it mention Lyons.  (Watkins Aff., Ex. 3 at 5, 10.)

By memorandum from Inspector Smith to Colonel Ellis, dated August 31, 2012, Smith set out his findings that Nelson, Lyons, and Investigator Campos had violated NYSP rules and regulations, and that Plaintiffs had been "less than forthright" in their statements. (*See* Plfs. Resp. ¶¶ 91–92, 95–96; Gagan Decl. ¶¶ 76-77 and Ex. F at 9042–9051.) There was no action taken against Nelson and Lyons initially, because the members of IAB could not agree on whether Nelson and Lyons' versions of events were credible and, therefore, whether punishment was warranted. (*See* Plfs. Resp. ¶ 98; Gagan Decl. ¶ 79.)  Defendants did not bring disciplinary charges against Campos for this finding, citing an 18-month statute of limitations.  (Watkins Aff., Ex. 30 at 59:16–60:23; Ex. 23 at 90:15-94:25.)

### e.  SIU Investigation Into Missing Drug Evidence

At some point, Superintendent D'Amico became aware of the IAB investigation into the missing drug evidence.[12]  According to Superintendent D'Amico, he was dissatisfied with the

---

[12] Defendants maintain that Superintendent D'Amico first learned about the investigation from Colonel Ellis in the Fall 2012, and he was subsequently kept up-to-date on developments at meetings with his staff.  (Plfs.

lack of results following the IAB investigation because: (i) after an eleven month investigation, the drug evidence had not been recovered and Superintendent D'Amico had been informed by Colonel Ellis that it likely never would be, and (ii) Colonel Ellis and his deputies could not reach a consensus as to whether to discipline Nelson and Lyons. (Plfs. Resp. ¶¶ 108–109, 111; Declaration of Joseph D'Amico ("D'Amico Decl."), ECF No. 80 at ¶¶ 7–8; Gagan Decl. ¶¶ 80–81.)  Plaintiffs dispute this point, noting that Colonel Ellis had advised Superintendent D'Amico that he believed that Investigator Bennett was responsible for the missing drug evidence since he had stolen drugs in another case and hidden evidence and case files.  (Watkins Aff., Ex. 27 at 120:5–123:18.)  Plaintiffs instead contend that Superintendent D'Amico told Colonel Ellis during the IAB investigation that the blame should not be laid "at the feet of Senior Investigator Bennett." (*Id.*)

On or about November 15, 2012,[13] Superintendent D'Amico directed the Special Investigations Unit ("SIU") and Counsel's Office to further investigate.  (Plfs. Resp. ¶ 112; D'Amico Decl. at ¶¶ 11; Gagan Decl. ¶ 82; Harford Decl. ¶ 13.)  According to Superintendent D'Amico, he did not believe it would have been productive for the same IAB investigators to take a fourth compelled statement from Plaintiffs, and he was concerned about Colonel Ellis's ability to be objective.  (Plfs. Resp. ¶ 113; Gagan Decl. ¶¶ 81–82. D'Amico Decl. ¶ 11.)  After Superintendent D'Amico re-assigned the investigation, Colonel Ellis informed him that Ellis and Nelson were friends.  (Plfs. Resp. ¶ 114; D'Amico Decl. ¶ 14.)  According to Superintendent D'Amico, this confirmed his concern that Colonel Ellis was biased and could not be objective.

---

Resp. ¶¶ 102–103; D'Amico Decl. ¶¶ 6–7.)  Plaintiffs dispute this, noting that Ellis testified that he had weekly briefings with D' Amico while IAB's investigation was ongoing. (Watkins Aff., Ex. 27 at 120:5–123:18.)

[13] Plaintiffs dispute the timing of D'Amico's direction to the SIU, noting that Defendants have not provided direct documentary evidence to support this factual assertion.  (Plfs. Resp. ¶ 112.)

(*Id.*)  This was the first and only time that Superintendent D'Amico directed that a new investigation be undertaken after an IAB investigation had been completed. (Watkins Aff., Ex. 23 at 35:17–36:5.)

### f.   Nelson's November 16, 2012 NYSDHR Complaint

Nelson filed a charge of racial discrimination with the New York State Division of Human Rights ("NYSDHR") on November 16, 2012 (Case No. 10158601.)  (Declaration of Neil Shevlin ("Shevlin Decl.") ECF No. 76, Ex. F; Watkins Aff., Ex. 12 at 2.)  In his complaint, Nelson named Lyons as a potential witness to the discrimination.  (Watkins Aff., Ex. 37 at 11.)  In the course of the NYSDHR investigation of Nelson's complaint, Lyons supported Nelson's statement that he had been subjected to disparate treatment. (Watkins Aff., Ex. 12 at 5–6 ("Witness 5"); Ex. 22 at 56:25–57:23.)

### g.   SIU Findings and Initiation of Disciplinary Charges

The SIU and Counsel's Office investigation, led by then-NYSP Assistant Counsel John Harford ("Harford"), concluded that in all likelihood the missing drugs would never be recovered, and that Plaintiffs had lied in all three of their compelled statements with respect to the missing drugs and their whereabouts on July 28, 2010.  (Plfs. Resp. ¶ 118; Harford Decl. ¶¶ 17–19; Gagan Decl. ¶ 84.)

On or about March 1, 2013, disciplinary proceedings were commenced against Nelson and Lyons on several charges, including for failure to comply with a lawful directive by providing false statement during NYSP's internal investigations of the missing narcotics.  (Plfs. Resp. ¶¶ 119–121; Watkins Aff., Exs. 35 and 36.)  While the disciplinary charges against him were pending, Nelson commenced the process to retire on or about March 7, 2013. (Plfs. Resp. ¶

122; Harford Decl. ¶ 23; D'Amico Decl. ¶ 19.)  Nelson was denied a retirement card. (Plfs.

Resp. ¶ 124; Harford Decl. ¶ 23; D'Amico Decl. ¶ 19.)

On May 2, 2013, Lyons appeared for a hearing on the charges against him. (Plfs. Resp. ¶

126.)  On or about May 8, 2013, the Hearing Board upheld the charges against Lyons, and

concluded that Lyons was not truthful in his three compelled statements and that he had lied

under oath to the Board.  (Plfs. Resp. ¶ 127; D'Amico Decl. Ex. C.)  The Hearing Board

recommended a punishment of 60 days suspension, one-year probation, and a Letter of Censure.

(Plfs. Resp. ¶ 128; D'Amico Decl. Ex. C.)

On or about May 13, 2013, Lyons provided a witness statement to NYSDHR as part of

its ongoing investigation of Nelson's race discrimination charge.  (Watkins Aff., Ex. 12 at 5–6

("Witness 5"), Ex. 22 at 56:25–57:23.)  Lyons' statement indicated that "[Nelson] was treated

differently than other White employees." (*Id.*)  On May 15, 2013 the NYSDHR issued a

determination of probable cause on Nelson's discrimination charge and specifically referenced

Lyons' statement in finding probable cause. (Watkins Aff., Ex. 12 at 8–10.)

Superintendent D'Amico did not agree with the Hearing Board's recommendation. (Plfs.

Resp. ¶¶ 129–130; D'Amico Decl. ¶ 27.)  Instead, Superintendent D'Amico believed that Lyons

should be terminated. (Plfs. Resp. ¶¶ 129–130, 32; D'Amico Decl. ¶¶ 27, 29.)

On or about May 30, 2013, Superintendent D'Amico drafted and conveyed to

subordinates a document modifying the Hearing Panel's recommendation regarding the penalty

to be imposed and terminating Lyons' employment with the NYSP. (Watkins Aff., Ex. 13.) Over

his six years as the NYSP Superintendent, out of dozens of hearing board cases, this was the first

and only time that D'Amico overrode a disciplinary hearing panel's recommendation of a

penalty less than termination to termination. (Watkins Aff., Ex. 38; Ex. 23 at 47:22–51:13, 107:5–21.)

However, Superintendent D'Amico allowed Lyons to resign after Lyons' union president asked D'Amico to accept Lyons' resignation in lieu of termination.  (Plfs. Resp. ¶¶ 132–134; D'Amico Decl. ¶ 29.)  On May 30, 2013, at D' Amico's direction, Lyons' superior officer called Lyons to a meeting, handed him the memorandum from D'Amico terminating him and told Lyons that he had ten minutes to decide whether to accept this recommendation of termination or resign on the spot. (Plfs. Resp. ¶ 135; Plfs. Cntr. ¶ 84; D' Amico Decl. ¶ 29, Ex. D; Ex. 22 at 72:4-76:4.) Faced with that choice, Lyons resigned. (*Id.*)

The parties dispute whether or not Superintendent D'Amico knew that Trooper Lyons was interviewed in connection with any of Nelson's complaints of discrimination. (Plfs. Resp. ¶ 137; D'Amico Decl. ¶ 31.) Defendants claim that D'Amico first became aware of the fact that Nelson had filed a complaint of discrimination with the NYSP Office of Human Resources from NYSP Counsel's office after the reinvestigation was assigned to Mr. Harford. (Plfs. Resp. ¶ 138; D'Amico Decl. ¶ 20.) Defendants also maintain that Superintendent D'Amico found out about Nelson's DHR complaint only after both Nelson and Lyons had resigned from the NYSP. (Plfs. Resp. 56.1 ¶ 142; D'Amico Decl. ¶ 25.) Plaintiffs note that D'Amico testified that he may have received notice of the NYSDHR decision and its contents on or about May 15, 2013. (Watkins Aff., Ex. 23 at 109:2–110:21; See Exs. 16, 17 (reflecting that D'Amico received, through NYSP counsel, the NYSDHR's No Probable Cause Determination regarding a SDHR charge brought by Lyons on June 16, 2014, the same day that SDHR issued the Determination)).

**LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In deciding a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). However, a court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted). "[W]hen confronted with evidence of facts that would support summary judgment, the [nonmoving party] must come forward with evidence in admissible form that is capable of refuting those facts." *George v. Rockland State Psychiatric Ctr.*, No. 10-cv-8091(NSR), 2014 WL 5410059, at *3 (S.D.N.Y. Oct. 23, 2014) (quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 177 (S.D.N.Y. 2009)) (internal quotation marks omitted). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292

16

(2d Cir. 2010) (internal citation and quotation marks omitted).  Further, "[s]tatements that are

devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly

supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d

Cir. 1999).

A party must support its position by citing to materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

admissions, interrogatory answers, or other materials.  Fed. R. Civ. P. 56(c)(1).  Affidavits may

be used to support or oppose summary judgment if the affidavit is "made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see also DiStiso v. Cook*,

691 F.3d 226, 230 (2d. Cir. 2012).  Importantly, a court may only consider facts that are

admissible in evidence.  *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997).

## DISCUSSION

### I. Nelson's Title VII Claims

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*,

provides that an employer cannot discriminate against "any individual" based on that

individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Plaintiff

Nelson's Title VII claims of race discrimination and retaliation are subject to the *McDonnell*

*Douglas* burden-shifting standard.  *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59,

70 (2d Cir. 2015); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *McMillan v.*

*City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  Under this standard, a plaintiff bears the

initial burden of demonstrating a prima facie case.  *Cortes v. MTA New York Transit*, 802 F.3d

226, 231 (2d Cir. 2015); *Kirkland*, 760 F.3d at 225; *Abrams v. Dep't of Pub. Safety*, 764 F.3d

244, 251 (2d Cir. 2014) (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999));

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d. Cir. 2013).  Assuming the plaintiff

demonstrates a prima facie case, a "presumption arises that the employer unlawfully

discriminated," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001), and the burden

then "shifts to the employer to give a legitimate, non-discriminatory reason for its actions."

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The "final and ultimate burden"

then returns to Plaintiff to demonstrate that "defendant's reason is in fact pretext for unlawful

discrimination."  *See Abrams*, 764 F.3d at 251; *Cortes*, 802 F.3d at 231.

### a.   Racial Discrimination Claim

To maintain a Title VII racial discrimination claim, a plaintiff must "proffer evidence that

(1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took

an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to

an inference of race discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir.

2014); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014).  "[I]f the plaintiff

has failed to show that there is evidence that would permit a rational factfinder to infer that the

employer's proffered rational is pretext, summary judgment dismissing the claim is appropriate."

*Patterson*, 375 F.3d at 221.

### i. Prima Facie Case of Race Discrimination

Defendants contend that Nelson is unable to establish that the actions he complains of

constitute adverse actions, or that any of the actions by the NYSP give rise to an inference of

discrimination.  The Court considers each element in turn.

A plaintiff suffers an adverse employment action if he or she "endures a materially

adverse change in the terms and conditions of employment," *Vega v. Hempstead Union Free*

*Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015), which "includes discriminatorily-motivated diminution of duties." *Preda v. Nissho Iwai Arn. Corp.*, 128 F.3d 789, 791 (2d. Cir. 1997). In support of his argument that he was subjected to an adverse action, Nelson cites the diminution of duties which resulted in a reduction in overtime pay and the loss of professional stature within the Division, and subjected him to ridicule and disdain from his peers.[14] (*See* Watkins Aff., Ex. 21 at 107:14–113:24.)  As such, Nelson has raised a material question of fact about whether the terms of his employment were adversely affected, and a rational factfinder could infer that these actions amounted to a "materially adverse" change.  *See Preda*, 128 F.3d at 791 (plaintiff raised genuine issue of material fact by showing he was excluded from departmental meetings and client outings, his job duties and responsibilities were downgraded, and his position was reduced to largely clerical tasks).

As to an inference of discrimination, Nelson argues that the evidence shows that he was subject to disparate treatment on the basis of his race.  A plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  The plaintiff "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Id.* (quoting *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997)).  In determining whether employees are similarly situated, courts consider: "(1) whether [they] . . . were subject to the same workplace standards," and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40.  The

---

[14] Plaintiff's claim based on his transfer to Hawthorne, was previously dismissed by the Court.  (*See* Opinion & Order dated September 22, 2016, ECF No. 25, at 8–9.)

comparators do not need to be shown to be "identical," rather, the standard "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.*

Plaintiff presents several potential comparators: Investigator Campos, Investigator Bennett, as well as a list of over a dozen other NYSP members who were found to have committed various offenses and were not terminated. (*See* Watkins Aff. ¶ 3.) Defendants note that while Investigator Campos and Investigator Bennett both had evidence issues, neither of them admitted to or were found guilty of falsifying a business record, as Nelson had. As to the other NYSP members, Defendants detail myriad factors that distinguish these individuals from Nelson, including the nature and severity of the misconduct at issue, supervisors involved, where the employees were stationed, and how the matter was investigated/resolved. (*See* Supplemental Declaration of Neil Shevlin ("Suppl. Shev. Decl."), ECF No. 88, ¶ 4.)

Drawing all permissible factual inferences in Plaintiffs' favor, the Court finds that Nelson has met this "low threshold, which the Supreme Court has described as 'minimal.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). A reasonable jury could find that Investigator Campos and Investigator Bennett were similarly situated to Nelson in that they both seriously mishandled evidence and made inconsistent or contradictory false statements to the NYSP, but that the misconduct was downplayed and they were treated more favorably. *See McGuiness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (finding inference of discrimination shown where plaintiff established employees' similarities "[i]n the broadest outlines" and affirmed that the employees' differences were "not so significant as a matter of

logic as to render defendant's disparate treatment . . . irrelevant to plaintiff's claims of discrimination.")

### ii.      Legitimate Non-Discriminatory Reason for Adverse Action

Defendants have met their burden to articulate a non-discriminatory reason for Plaintiff's diminution of duties.  At this stage of the *McDonnell Douglas* standard, the Court need not assess the credibility of the evidence proffered; it must decide whether defendants have "introduced evidence that, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason" for the change in Nelson's employment duties.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).  This standard is satisfied.  Defendants proffer evidence that Nelson was not permitted to handle evidence or adopt new cases because he was under investigation for missing evidence, he had admitted to falsifying a business record in connection with respect to the missing laptop computer, and he had many cases that had to be closed.  (*See* Loughran Aff. ¶¶ 20 and 23–25.) Moreover, Defendants submit evidence that the reduced number of hours of overtime Nelson received in 2012 after his transfer are attributable to the fact that he was placed on administrative duty (not picking up new cases), had a diminished case-load, and had a significant increase in the number of the days he took off.  (See Plfs. Resp. ¶¶ 52–57.)

### iii.     Pretext

In light of Defendants' legitimate non-discriminatory reason for Plaintiff's change in duties, "the presumption of discrimination drops out" and Plaintiff must now "present evidence from which a fact-finder could reasonably conclude that the employer's reason was pretextual and that the real reason was discrimination." *Roge*, 257 F.3d at 168 (citing *Tarshis v. Riese Org.*, 211 F.3d 30 (2d Cir. 2000)) (internal quotations and alternations omitted).

While "direct evidence of [discriminatory] intent" is rarely available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Holcomb*, 521 F.3d at 137 (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1124 (2d Cir. 1994)) (internal quotations omitted), even in the discrimination context, a nonmoving party must submit "hard evidence," *see Shelton v. Trustees of Columbia Univ.*, 369 F. App'x 200, 201 (2d Cir. 2010) (summ. order) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)), and is required to provide "more than conclusory allegations of discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *accord Pathare v. Klein*, 347 F. App'x 646, 647 (2d Cir. 2009) (summary order).  Thus, to defeat summary judgment on the issue of pretext, a plaintiff must demonstrate "that discrimination played a role in motivating the adverse action taken against the plaintiff." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010).

Where, as here a plaintiff offers no evidence that the discriminatory motive "was a factor" in decision on the adverse employment action, or only makes a "conclusory allegation[s] . . . unsupported by any actual evidence of discriminatory motive," he cannot defeat summary judgment.  *Shub v. Westchester Cmty. Coll.*, 556 F. Supp. 2d 227, 256 (S.D.N.Y. 2008);  *see also Diaz v. City Univ. of New York*, No. 13-CV-2038(PAC)(GWG), 2017 WL 3088394, at *14 (S.D.N.Y. July 20, 2017) (no genuine issues where plaintiff offers "no nonspeculative basis on which to reach" a conclusion that the reason advanced by defendants is only pretext).

Plaintiffs' briefing does not directly address Defendant's legitimate, non-discriminatory reasons for Nelson's change of employment duties.  Plaintiffs generally assert that Nelson was

"singl[ed] out" (Pls.' Memo at 16), but this conclusory allegation is drawn from Investigator John's observations regarding Nelson's transfer, which did not encompass the changes in Nelson's job responsibilities. (*See* Watkins Aff., Ex. 7 at 14–15.) Nelson offers no other evidence of invidious discrimination or impermissible racial motivation. Ultimately, Nelson does not establish that there are sufficient facts from which an inference of discrimination can be drawn such that a verdict in Plaintiffs' favor could be sustained. Where such is the case, summary judgment is warranted. *See Patterson*, 375 F.3d at 221; *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

### b. Retaliation Claim[15]

Plaintiff Nelson's second Title VII claim asserts that actions taken by NYSP were in retaliation for engaging in protected EEOC-related activity. As with the substantive Title VII claim for discrimination, retaliation claims are subject to the *McDonnell Douglas* standard. *Ya-Chen Chen*, 805 F.3d at 70.

A prima facie case for retaliation requires a showing that the employee (1) "was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). Under the *McDonnell Douglas* standard, if Plaintiff makes a prima facie showing and defendant then provides a legitimate non-retaliatory reason for the adverse employment action, a plaintiff then "must prove 'that the desire to retaliate was the but-for cause of the challenged employment

---

[15] This Court's dismissal of Nelson's race discrimination claims under Title VII does not preclude him from prevailing on a retaliation claim. *See Grozynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 n.8 (2d Cir. 2010) (noting that employee "need not establish that the conduct she opposed was in fact a violation of Title VII"); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 454, 473 (S.D.N.Y. 2011) (noting that a "plaintiff need only 'have a good faith, reasonable belief that he was opposing an employment practice made unlawful . . . .' [h]e need not prove the underlying discrimination allegations") (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006)).

action.'" *Ya-Chen Chen*, 805 F.3d at 70 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).  Here, Defendants do not dispute that Nelson engaged in a protected activity: filing an internal discrimination complaint with the NYSP and complaints with the NYSDHR. Instead, Defendants argue that there was no adverse action and no causal connection exists between the protected activity and the alleged adverse action.

A plaintiff claiming retaliation under Title VII "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (internal citations omitted). As with the Title VII discrimination claim, Nelson asserts the same adverse actions regarding the diminution of his duties (Pls.' Memo at 20–21.)  However, the undisputed evidence establishes that this purported adverse action occurred before the protected activity.  Nelson's placement on administrative duty (September 30, 2011) occurred prior to both his filing of his internal EEO complaint (October 12, 2011) and both of his NYSDHR complaints (November 16, 2012 and July 22, 2013). Therefore, Nelson's prima facie retaliation claim fails.  *See, e.g., Fenner v. New Corp.*, No. 09 Civ. 09832, 2013 WL 6244156, at *26 (S.D.N.Y. Dec. 2, 2013) (under Title VII, there "can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.") (quoting *Pinero v. Long Island State Veterans Home*, 375 F.Supp.2d 162, 168 (E.D.N.Y. 2005)); *Nakis v. Potter*, 422 F. Supp. 2d 398, 423 (S.D.N.Y. 2006) (observing that an adverse action was not causally connected to protected activity "because it predate[d], rather than follow[ed], the date that [plaintiff] first engaged in protected activity").

**II.  Nelson and Lyons' § 1981 Retaliation Claims Against D'Amico**

Plaintiffs each bring retaliation claims pursuant to 42 U.S.C. § 1981 against

Superintendent D'Amico.  As a preliminary matter, these claims are asserted in the Third

Amended Complaint as "made actionable against [D'Amico] by 42 U.S.C. § 1983."  (TAC ¶¶

103–104.)  In *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme

Court held that "the express cause of action for damages created by § 1983 constitutes the

*exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental

units." *Id.* at 733 (emphasis added).  The Second Circuit has reaffirmed *Jett's* ongoing viability

in *Duplan v. City of New York*, 888 F.3d 612, 620–21 (2d Cir. 2018) ("[Section] 1981 does not

provide a separate private right of action against state actors.").  Thus, these § 1981 claims must

be construed as causes of action brought under § 1983.  *See In re New York City Dep't of Educ.*,

No. 15-CV-7150 (AJN), 2019 WL 1433163, at *5 (S.D.N.Y. Mar. 29, 2019).

**a.   42 U.S.C. § 1983 Retaliation**

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected,

any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights

elsewhere conferred by those parts of the United States Constitution and federal statutes that it

describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*,

592 F.3d 121, 127 (2d Cir. 2010).

To prevail on a retaliation claim under § 1983, a plaintiff must show: "(1) defendants

acted under the color of state law, (2) defendants took adverse employment action against him,

(3) because he complained of or otherwise opposed discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015); *see also Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (Section 1983 retaliation claims "are analyzed pursuant to Title VII principles.") "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (internal citations omitted). If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id.* The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* Furthermore, "an individual may be held liable under §§ 1981 and 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004)).

Plaintiffs assert two instances of retaliation: (i) D'Amico's decision to initiate a second investigation into the missing drug evidence (i.e., the SIU/Counsel's Office investigation); and (ii) D'Amico's decision to bring disciplinary charges against Plaintiffs, resulting in Nelson's resignation and Lyons' termination. Again, Defendants do not dispute that Nelson and Lyons engaged in a protected activity.

### i. Second Investigation Into Missing Drug Evidence

Defendants argue that Plaintiff is unable to establish a causal connection between the protected activity (Nelson's filing of a NYSDHR Complaint on November 16, 2012), and the adverse employment action. According to Defendants, D'Amico initiated the second

investigation on November 15, 2012, the day *before* Nelson engaged in the protected activity.  If this were undisputed, the inquiry might end here because the purported adverse action occurred *before* the protected activity.  *See, e.g., Fenner*, 2013 WL 6244156, at \*26; *Nakis*, 422 F. Supp. 2d at 423.  But Plaintiffs dispute this fact and argue that Defendants' two pieces of supportive evidence—Harford's Declaration and an email—are inconclusive.  (*See* Harford Decl. ¶ 82 (the assignment of this investigation occurred "on or about November 15, 2012."; Shevlin Decl., Ex. L (email dated November 15, 2012 to Harford referencing "the IAB investigation previously discussed").)

Plaintiffs maintain that a reasonable jury may conclude that Defendants' second investigation of the missing drug evidence—which focused exclusively on plaintiffs and was unprecedented (Watkins Aff., Ex. 23 at 35:17–36:5)—constituted an adverse action.  A jury may conclude that the investigation was a predetermined and single-minded attempt to support disciplinary charges against Plaintiffs which, if retaliatory, would likely deter a reasonable employee from engaging in protected activity.  For example, the Second Circuit recognized a similar theory of "selective treatment" retaliation in *Diesel v. Town of Lewisboro*, which described how the plaintiff, a New York trooper, could have "show[n] that police officers generally did not enforce the regulations against each other, but that the defendants vigorously investigated the . . . incident [involving plaintiff] because of [plaintiff's] cooperation in the [protected activity]."  232 F.3d 92, 104 & n.7 (2d Cir. 2000).

Defendants state that the legitimate, non-discriminatory purpose for this second investigation was Superintendent D'Amico's sincere intent to seek resolution regarding the unresolved questions in the IAB investigation.  (*See* Plfs. Resp. ¶ 111.)  Plaintiffs vigorously contest this, pointing to other possible discriminatory motivations.  (*See id.*)  This presents

factual and credibility determinations as to whether Superintendent D'Amico was aware of the protected activity, and whether a causal connection exists between the protected activity and the adverse employment action. Taken together, the irregularity of D'Amico's order for a second investigation, the proximity of investigation to the filing of Nelson's NYSDHR complaint, and uncertainties regarding D'Amico's motivations all point to genuine issues of material fact which preclude summary judgment on this claim.

### ii.   Disciplinary Charges

Plaintiffs also claim that the disciplinary charges brought against Nelson and Lyons constitute an adverse action. *See Broich v. Inc. Village of Southampton*, 462 Fed. App'x 39, 47 (2d Cir. 2012) (summ. order) ("[T]he initiation of disciplinary charges leading to an administrative hearing permitting 'suspension with pay and carr[ying] with it the threat of possible termination' constitutes adverse employment action"). Moreover, they characterize both Nelson and Lyons's resignations as constructive discharges, which is sufficient to demonstrate an adverse action. (*See* Plfs. Cntr. ¶¶ 72, 84–85.) *See, e.g., Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188–89 (2d Cir. 1987).

Defendants respond that Superintendent D'Amico averred that he was not aware of the NYSDHR complaint of discrimination until after both Plaintiffs had resigned. While Plaintiffs do not have concrete evidence refuting this, they present circumstantial evidence that could persuade a jury to doubt D'Amico's assertions. (*See* Plfs. Resp. ¶¶ 137–138.) Moreover, although Defendants view no causal connection between Nelson's filing of the NYSDHR complaint and Lyons's testimony in support of that complaint and the disciplinary charges filed against them, the circumstantial evidence noted with respect to the SIU investigation is applicable to these claims as well. Plaintiff present additional factual peculiarities, such as

Superintendent D'Amico's decision to override the Lyons Hearing Panel's penalty recommendation in favor of termination—the first and only time as Superintendent that he overrode the Hearing Board to impose termination when it had recommended a lesser penalty. (Plfs. Resp. ¶ 131; Plfs. Cntr. ¶ 83.)

While Defendants maintain that the disciplinary charges were filed because of Plaintiffs' false statements during the investigation into the lost evidence, establishing the legitimate reason, a reasonable jury may conclude otherwise.   After reviewing the evidence presented, they may conclude that Superintendent D'Amico was aware that Lyons was supporting Nelson's internal complaint of discrimination and was identified as a key supportive witness in the NYSDHR complaint, and that Superintendent D'Amico sought retaliation. For these reasons, the Court finds genuine issues of material fact which preclude summary judgment on this claim.

### III. Lyons' First Amendment Retaliation Claim

Plaintiff Lyons' First Amendment claim, brought under 18 U.S.C. § 1983, asserts that Superintendent D'Amico violated Lyons' First Amendment rights by committing various acts of retaliation against him for engaging in protected speech.   To properly assert a First Amendment retaliation claim, a public employee such as Lyons has the burden of demonstrating that (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment decision; and (3) a causal connection exists between his speech and that adverse employment determination, so that it can be said that his speech was a motivating factor in the adverse employment action. *Cioffi v. Averill Park Central School Dist. Bd. of Education*, 444 F.3d 158, 162 (2d Cir. 2006).

Even assuming for purposes of this motion that Lyons engaged in protected speech, Defendants argue there is no evidence that any adverse employment action was related to that speech. As set forth above, the Court finds genuine issues of material fact as to whether Lyons'

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Nelson's Title VII claims are dismissed with prejudice. Plaintiffs' § 1981 retaliation and First Amendment retaliation claims remain. A Pretrial Conference is scheduled for July 30, 2020 at 11:00 am. Accordingly, the Court respectfully directs the Clerk of the Court to terminate the motion at ECF No. 75.

Dated:   June 2, 2020                         SO ORDERED:
          White Plains, New York

                                             NELSON S. ROMÁN
                                      United States District Judge